Next case, the United States v. Levi Good morning. Good morning, Your Honor. Oops, wow. Sorry. Margaret Fuldis, assistant federal public defender on behalf of the appellant Amnon Levi. May it please the court. I will be addressing the admission of Mr. Levi's statements to law enforcement at trial and relying on my briefs for all the other issues. Mr. Levi made statements to law enforcement on September 26, 2016 at about 6 in the morning. The main interrogation lasted about 35 minutes and then there were additional statements that he made over the course of a couple of hours. About the, you're objecting to the absence of Miranda. Correct. Right. Yes, Your Honor. All right. Now, is it my understanding that he was interviewed in a parking lot, a place that he was familiar with and that during the course of this conversation, he could have gone to his quarters, right? I'm sorry, could. I mean, why is your position is that he was in custody? Your Honor, there are several factors that are applicable in his case and the factors are there was a very early morning interrogation. There was a coercive show of authority at his apartment. When they whisked him out of his apartment, they removed him from his apartment. They retained his driver's license and his cell phone. They, he had a mandatory police escort everywhere he went from the moment they took him out of his apartment for the whole rest of the time that he was with them. And also he was, they exploited the fact that he had no comprehension of the legal principles. He didn't understand the word prosecute. He didn't understand the word warrants. Even at trial, he didn't understand what it meant to rest your case. He had very limited understanding of these legal proceedings that he was being subjected to. And also there was an exploitation of the fact that he did not speak English well. And actually his lawyer made that very clear in an opening statement at trial where he explained to the jury in his opening that Mr. Levy did not understand everything the agent was asking during the interrogation and that the statements that Mr. Levy made reflected a misunderstanding of the questions and not admissions of guilt. I thought the district court during the course of the trial offered to get an interpreter for your client and your client said he didn't need an interpreter, that he understood English well enough to go forward with the trial. Is that not right? It is true that the court asked if he needed an interpreter, but if you look at the statement of how Mr. Levy responded, he didn't say I understand everything just perfect. He said there's words that I don't understand. In general, I understand what's going on. He didn't say he understood legal terms. He didn't understand what it meant to rest his case. And that was borne out through the trial. He was having those kinds of difficulties, basic legal concepts he did not get. But yet, he and his lawyer both turned down the opportunity to have an interpreter. That is true. And we didn't raise that particular issue as an issue in the brief, but it bears on whether he understood what he was answering and whether his statements were admissions or misunderstandings. And so, the relevance of that really is that it was clear to the district court during trial right at the beginning that not only was there an issue possibly with an interpreter, but there was an issue possibly with the interrogation, there was possible misunderstanding of what was even going on and what was being asked, which would lead, which would be a huge red flag. But you've got to establish that they were obliged to give him a random warnings because the interrogation was custodial in nature, that he was under arrest, right? That's correct. And I was. And the difficulty you have here, the added problem you have is that beyond simply carrying your burden on that point at a suppression hearing, no objection was made, right? At the trial. And so, we can only review this for plain error. That's correct, Your Honor. And as I was starting to talk about the different factors that existed, I had submitted supplemental authority with a number of cases because there are different scenarios that arise repeatedly and different factors that the courts do continually look at. And the six that I was referring to was the earliness of the interrogation, the coercive show of authority at the apartment, retaining a driver's license, which obviously would impede somebody's ability to leave and would not make them feel like they were free to leave because if they did try to drive away without their license, obviously they would be subject to arrest. Having a mandatory police escort from the moment they got there and they removed him for the whole rest of the time they were together. And also, the whole issue of not being able to communicate well and not understanding basic legal concepts. So those were the six that I was starting to go through. The early morning hours, about 5.30 or 6 in the morning is when they showed up. The agent testified at trial that he brought a team of these agents and he said that the more was better, especially when they first arrived because sometimes things can go wrong at the door. So he was trying to bring an entire team. I do have to call the court's attention that in my reply brief, I had thought that there was a specific number of agents, but I was wrong. It was that the agent had said that the more was better, specifically with reference to being at the initial part of going to the door. I have another question. Yes. There were a number of enhancements that got your client up to 168 months, I believe, at the top of the range. Correct. Correct. Well, amongst those enhancements was an enhancement for distribution. He was not charged with distribution. That's correct. It was based on the peer-to-peer network for the sentencing. But as far as the factors... So you agree with that? Well, we didn't raise it in our briefs as... I know that, but I mean, you don't challenge that enhancement. I believe the case law allows that enhancement. With respect to the factors that I was speaking about, I was still working on the show of authority. As you review the entire record, as you are allowed to do, Mr. Levy had explained during the show of authority at his door in the morning at 5.30 a.m. Let me put the question this way. Was it plain or obvious that this was a custodial arrest? Yes. Given the fact that there was no motion to suppress, there was no hearing, there was no interrogation, and what we're left with is basically the transcript. Yes. And the reason why it was plain is because there are these factors that show that he was not free to leave and that no reasonable person would have felt they were free to leave or that they were free to stop the interrogation. And as I was starting to say, Mr. Levy explained that he was so terrified when he looked at his door, he thought he was under attack. He called 911, and he did not open that door until a 911 operator told him that the police were outside his door and that he should go ahead and open the door. So that's the kind of initial reaction that you have, the initial impression that the agents made, and that's a huge factor for the show of authority. The second thing, again, was he not only did they retain his license, they retained his phone, so he did not have the ability to even use his phone to try to call people, to try to cancel. He was an aviation instructor. He had a meeting with TSA. He couldn't even access his phone to do that. So his movements were strictly limited by the officers that were there. As I said before, he had a... But that would be normal whenever they were executing the warrant, wouldn't it? Well, it would show that he doesn't have power over what's going on. There'd be some limitation if they walk into your house with a warrant to search your house for X, Y, or Z. They're going to keep you in a particular location, perhaps, as they go about their business, right? Of course. For their own safety, even without any particular indicia of danger. They could do that. As far as a reasonable person would understand what's going on, when they're not allowed to use a phone, they're not allowed to have their driver's license. So any time you go into effect a search warrant in a house and the owner, occupier of the house is present, so long as he remains in the house, he's under arrest? I'm sorry. Can you repeat the question? You're under arrest simply because they went into the house to execute the warrant and you're there? No. I think the factors that I'm looking at where he's terrified, calls 911 because he thinks he's under attack, because that's the show of authority that they had at the door, in addition to him not understanding what's going on, it's clear to the agent that he doesn't understand because he asks, what is a warrant? He said, what mean that? He clearly can't speak standard English. What mean that? What's a warrant? And what does it mean for you to be prosecuting? He doesn't understand the basic concepts they're talking about. Okay. Under all those different factors, including the not understanding basic legal concepts and having language difficulties, no reasonable person would think that they were free to leave or that they were free to stop the interrogation. It was incumbent upon law enforcement at that time to be giving him his Miranda warnings. The error was plain on these factors. I had cited several cases, Florida versus Royer, which talks about retaining somebody's property, United States versus Thompson, which talks about somebody, law enforcement retaining a driver's license, United States versus Tovar Rico, which talks about the show of authority. And then there were some other cases that I said that were outside of the circuit, but United States versus Short, United States versus Brown-Panez, which both talked about the idea that people who are ignorant of the law are easily exploitable, and when they have language difficulties, that they're also easily exploitable, and that all comes together and coalesces. It graves Kell Levy, quote, like we walked about, we were just doing a search. You're not under arrest or anything. We just wanted to talk to you. He did say that. Did they tell him that? They told him that, but their actions said otherwise because they took him out of his apartment, they directed him into a minivan, they interrogated him for 35 minutes intensely, and when he got out, they weren't saying, you're free to go. They're saying, you want to stay here in the van with one agent or you want to come with me up to the apartment? And when he got up to the apartment, they said, oh, you're free to move, but we're going to be following everywhere you go. That's not a freedom of movement. That is a constant. But it wouldn't be enough to establish that he was briefly detained to execute the warrant. You'd have to show that it was a custodial interrogation. Well, that's one of the factors. Right, but you have to show that he was under arrest. It wouldn't be enough to simply say he was detained. That's correct. It wouldn't have to give Miranda warnings for a detention unless it was the functional equivalent of an arrest, right? Well, the standard is under the totality of the circumstances, whether a reasonable person in the suspect's position would not feel free to leave. And the factors that I've outlined. He'd have to reasonably believe he was under arrest, right? Tense amount to arrest. I don't think he has to believe he's exactly under arrest, but it has to be tense amount and very close to arrest. And when he's, all the factors that I've named. Well, if you stop someone, the case we just heard before this one was a Terry stop, maybe a traffic stop. But if they stop someone to inquire further and they have some reason, suspicion to detain him briefly, they're not obliged at that point, even though he's not free to leave, to give him Miranda warnings, are they? I would say that the fact that he's not allowed to leave is another very big, right? But the mere fact that you're being detained, which means you can't leave, doesn't put you under arrest. Well, I don't think he was merely being detained. I outlined that, but I'm simply saying you've got to show something more that it's the functional equivalent of an arrest, right? That's correct. Thank you, Your Honor. And we believe that we have under these factors and under the law that I cited, and I believe my time is up. Thank you very much. Good morning, Your Honors. May it please the court. I'm Brandy Galler on behalf of the United States and seated at council table is the trial attorney, Mackenzie Dwayne. Where I would like to start the conversation this morning is to pick up on something that you mentioned, Judge Marcus, as far as what information was known to the trial judge at the time that he was allowing the admission of the recorded statement and its transcript. And this is the information that was presented. Agent Graves testified on direct that at approximately six o'clock in the morning, a team came to Mr. Levy's residence to execute a search warrant. He said that they knocked on the door and made contact with Mr. Levy. He said that Mr. Levy waited outside while a number of the officers went to clear- How many officers were there to execute the warrant? The record is not clear on how many officers were there at all. All he said was that there was a team of officers. That's all we know. So some officers went in to clear the residence, and Mr. Levy waited outside during that time. Agent Graves says that he asked Mr. Levy, he told him, we would like to speak to you, and that Mr. Levy's response was, sure. What if Levy had said, thanks very much, I've got nothing to say to you, and I'm going off to McDonald's to get myself a breakfast. Was he free to do that? Absolutely. They would have let him leave? They were there to execute a warrant on the house. I understand why they were there. I'm asking whether he was free to leave. Yes. There is nothing in the record that indicates that he was not free to leave. They talk about coercive environment. Is that a coercive environment? There is not record evidence that it was a coercive environment. What . . . Judge Marcus says, you don't know how many, but there's more than one officer, so there's probably a group. I don't understand, if you've got a bunch of officers standing there, why you would go to McDonald's and have breakfast? You'd say, excuse me, I'm going to go have breakfast? Do you think he could have done that? Do I think that he could have left? Yeah. Absolutely. I do believe that the officers were not prohibiting him from leaving in any way. There is not any evidence on the record of that. What the officers . . . Did the officers tell him he was not under arrest? Yes. They do say . . . Which officers said that? It's Agent Graves, and it's on the recording toward the end of the time when they are doing the interview in the minivan. It's at the end of that conclusion when Agent Graves says, well, I'm going to go back in the house to check to see how the progression of the search warrant is doing. You're welcome to stay here, or you can come with me, whatever you want. He says, well, I'd like to use the bathroom. He goes back into the apartment and remains there for the rest of the time. Why did he feel obliged to ask permission to go to the bathroom? Well, the record's not clear as to . . . What might we reasonably infer from that? That he was certainly didn't . . . He didn't think he was free to roam around his house as he pleased, did he? To whom? Or he never would have said, can I go to the bathroom, please? He'd have just gone to the bathroom. Well, the agents did tell him once they were back in the apartment that they would need to follow him around for officer safety, and that's not unreasonable. Did they say that to him before or after he asks for permission to go to the bathroom? He doesn't ask for permission to go to the bathroom. What happens is the officer says, I'm going to go back into the residence to check to see how the search warrant is progressing, and you're free to come or stay here. And he says, I'd really like to go to the bathroom, or something. So he does ask to go to the bathroom. Oh, he makes a statement that he needs to go to the bathroom. That would be a request, right? He puts it in, I'd like to go, please, as opposed to, I'm off to the bathroom. Yes, Your Honor, yes. And there are other- And I'm simply asking whether one might reasonably infer from that, that at least as he sought, he wasn't free to do what he wished in the house. I think there's a- They had limited his movement while he was in the house and they were executing the warrant. Absolutely, Your Honor. But I do think that there is a distinction between having some observation of what actions you're taking and being under a custodial arrest for the purposes of whether or not the officer- And he was told that they were going to keep an eye on him while he was in the apartment. Yes, he was, for officer safety. Right, I understand the reason, but the fact is he still felt limited in what he could or could not do. He was detained in some fashion. He, well, yes, he was, he was aware that the officers were going to be monitoring his actions, definitely. However, Your Honor, to step back- Seems to me the argument ought to be, but it wasn't plain that he was under arrest. And that's- It wasn't obvious that he was under arrest. And that's the standard we have to use here because there was no objection. That's exactly what I wanted to move us back to, Your Honor, is the information that the And that very limited information, again, was only that a team of agents made contact with Mr. Levy, that they asked him, that they said, we would like to speak to you. And he replied, sure. And then they went into the minivan, asked him if it was okay to record the interview. He agreed. And then the trial attorney moved for the admission of the statement. There was no objection at all. Based on those details, that's all that the trial court knew. There would have been no reason whatsoever for the court to sua sponte, be concerned that there was a Fourth Amendment violation, and suppress the statement. And then, even when the evidence, once it had come in and was being played for the jury, it was a very calm discussion. Mr. Levy is dressed in a T-shirt and cargo shorts. Unlike, I believe that there may have been references in Appellant's brief that he was in his pajamas and barefoot. That's not the case, and you can see that on the video. He spoke up for what he needed immediately. He was comfortable to do that. As soon as he got in the vehicle, he said, ooh, the air conditioning's really high. Can we turn that down? And the agents say, of course, however you make yourself comfortable. And they show him how to make the adjustments himself. There are no weapons, no handcuffs, there's no use of force at all. And there's, therefore, nothing there that the trial court would have had any reason to, on its own, think that there was a problem and call for the suppression of the statement. The other information, some of the other information that Appellant has referenced, did not come in, not even at any point during the trial, but it wasn't until the defendant's allocution at sentencing. And the only information that he added was that he said there were heavy knocks on the door, he says at 5.30 in the morning, and that he was concerned because he wasn't expecting any visitors. So he took the time to call the police and verify that this was legitimate law enforcement, these were legitimate law enforcement officers at his house. When they arrived at 6 in the morning, was the defendant all dressed or was he in pajamas? We don't know from the record, it does not seem from the record, I should say, that there was time for him to have done anything else to change before he, or from the time the officers got there. Was he out in the parking lot in pajamas or was he dressed? The video of the statement shows him wearing a t-shirt in the minivan, and then by the time he, as he's getting out of the vehicle, you can see that he is wearing shorts that you later in the video see when he's sitting in the apartment, are cargo shorts. They're not pajamas. He was fully dressed. He was wearing a t-shirt and cargo shorts. I want to address one point that Appellant made about a driver's license. There is not any evidence in the record clearly establishing at any point that the defendant did not have his driver's license with him, that the police had retained that. I thought your colleague said that they took his driver's license from him. I believe she did say that. Are you saying there's no evidence to support that? I am saying that there's no clear evidence in the record of that. The closest I can find is that there is a reference when they are back in the apartment that Agent Graves says, here are some of the things that were with your phone. And the reason they took his phone, of course, is because they were there to execute a search warrant for electronics. So it was necessary for them to take his cell phone. It appears that there may have been some things with the cell phone that he requested to have back and that Agent Graves gave those back to him. Whether that included a driver's license or not is not clear at all from the record. And as far as just one other point about custody, again, not that we should even get there because of the limited information that was known to the trial judge and that we are evaluating this under a plain error standard. But Mr. Levy did, throughout the questioning that morning, continue to make references to what he was going to be doing later that day and whether he could get his phone back as soon as possible because it was his business. There's no indication that he believed that he was in custody and going to be taken to jail that day. So unless the court has any further questions, we would rest on our brief in all other respects. Thank you very much. Thank you. Ms. Foltz, help me. Was there some record evidence that might have arguably suggested that they took his license? Yes, there was. Could you just sort of point me to it? There was the testimony of the crime scene technician who talked about how she was photographing his driver's license while he was down in the car being interrogated. That's one. And then in the statement itself, there is a more... Meaning the transcript, right? The statement, the transcript of the statement taken by the defense, yeah. Where they talk a little bit, and it's less direct, but it talks about, they're talking about returning stuff to him. But the crime scene investigator makes it pretty clear because she's talking about how he had a cell phone wallet and she had to take a picture of his driver's license as part of her initial entry into his house, which is where his driver's license was at the time when he was already removed from the room. The other thing is the clothes that he had on were his pajamas. He didn't have superhero pajamas. He had cargo and T-shirt, but that was his pajamas. When he gets arrested and they put the handcuffs on him, he's saying, can I put on some pants? Can I get changed? Because for him, that's what his nightclothes were. There's no indication in the... And they give him leave to get dressed. No, they did not. That's, I'm talking about when he was actually arrested, when they actually put the handcuffs on. So, but that's what he was whisked out of his apartment in. Those were his nightclothes. Again, he didn't have superhero pajamas. If I hear your argument right, and tell me if I've missed it or if there's something else, you make reference to the following things which suggest that this was custodial, and therefore Miranda had to be given. One, there was some language impediment. Two, there were a fair number, we don't know how many, of executing officers in the house and outside the house. Three, they took his driver's license from him. Four, it was early in the morning and he had his pajamas on, from which you say it was plain or obvious that this was a custodial arrest. Do I have it right or is there something else? There's also the fact that he had very little understanding of the legal concepts that were, he just didn't have an understanding. Beyond simply the language problem. Correct. He had very little understanding of the legal concepts and proceedings that he was being subjected to. He didn't have, there's nothing in the record that shows he would have any clue that he had rights that he could invoke. He certainly did not ever think that he was going to be going to McDonald's to get a cup of coffee when they showed up at that door. And he didn't have, there's nothing in the record that indicates that he would think that he could say, I don't feel like talking to you. He had such little understanding of the legal concepts that it's clear that he wouldn't, he doesn't know what prosecute means. What record evidence do we have about how long he was here? He was here about 10 years. He lived in Israel for about 40 years. What was his legal status? He was a citizen. He's a citizen. So that's in the record. He's dual, I believe so. I don't mean coming out later from the probation department, but at the trial it was clear that he was. I don't know. I don't know if they referenced his citizenship during the trial. He was a citizen and he was here 10 years, and he never asked for an interpreter during the course of the trial and rejected it when the court asked. Yes, but if you look at the statement that he has when he's talking to the agent, you can see there are clear misunderstandings going back and forth. He doesn't talk in standard English. You can see even in the trial, like I said, he did not understand what it meant to rest his case. And his lawyer said it in opening. He has the ability to speak English in like a casual conversation. He's an aviation instructor, so he has studied English vocabulary that has to do with aviation. But when it comes to legal proceedings and these kinds of fine distinctions that the agents are trying to make with him, he didn't have any ability, that he had rights to invoke. And his lawyer said it right in opening statement. As far as what the trial judge knew at the time when those statements came in, that's one factor that was a huge red flag. His lawyer was saying he didn't understand what the questions were during the interrogation. And just like the judge knew enough to say, do you need an interpreter? He also, because the lawyer specifically referenced the defendant not understanding the interrogation, that should have been a red flag right from the opening statement that the court should have at least addressed it with the attorney, possibly sidebar or something. That means something because it was that clear. And I also noticed that my time is up. Thank you very much. Thank you. Thank you both. We'll move to the next case.